**BRUNO & STILLMAN, INC., Plaintiff,**

**v.**

**GLOBE NEWSPAPER CO., Defendant.**

**Nos. 80–1172, 80–1173.**

United States Court of Appeals,
First Circuit.

Argued June 2, 1980.

Decided Oct. 17, 1980.

James F. McHugh, Boston, Mass., with whom Bingham, Dana & Gould, Boston, Mass., was on brief, for The Globe Newspaper Co.

Robert S. Potters, Boston, Mass., with whom Grover Henry Nix, III, and Nix & Wendell, Boston, Mass., was on brief, for Bruno & Stillman, Inc.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, MAZZONE, District Judge.*

* From the district of Massachusetts, sitting by designation.

COFFIN, Chief Judge.

These are cross appeals arising out of the actions of the district court in dismissing a negligence count in plaintiff's libel complaint against defendant newspaper and in granting plaintiff's motion to compel the disclosure of three of defendant newspaper's confidential sources and information conveyed by them to defendant. Each appeal presents an important question: first, whether plaintiff corporation, as described in the complaint, was correctly held by the district court to be a "public figure", and must thus meet the standard of "actual malice", i. e., proof that defendant's statements were made "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not", under *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); and second, whether, on the record so far established in this case, defendant has a privilege to refuse to reveal confidential sources relating to the subject matter of the statements sued upon.

Plaintiff, Bruno & Stillman, Inc. (hereinafter "the company"), is a Delaware corporation engaged in the manufacture and sale of commercial fishing boats with a principal place of business in New Hampshire. The defendant is the Globe Newspaper Company, publisher of the *Boston Globe* (hereinafter "the *Globe*"), with a principal place of business in Massachusetts. According to the facts alleged in the complaint, the company began building 35 to 55 foot fiberglass workboats in 1971, selling eight in that year. By dint of "enormous work and effort ... in manufacturing, promoting and selling boats", sales increased steadily, so that in 1977 the company sold nearly forty 35–foot boats, forty 42–footers, and ten 55–footers, and some newly introduced 35–foot pleasure boats. Between 1971 and the end of 1977 the company had sold over 400 boats "throughout the world" and had become the largest builder of fishing boats in New England. It enjoyed an "excellent reputation as a quality boat builder in the tough and competitive commercial fishing industry".

On Sunday, December 25, 1977, the *Globe* published a full page story on the company. On the following day, the *Globe* published a second such story, occupying parts of three pages, over the byline of William P. Coughlin. Both stories listed and described alleged reports of some thirteen defects observed in one or more of five named boats built by the company. Critical comments of owners, surveyors, Coast Guard marine inspection officers, some company employees, and a repairman were narrated. Roughly a fifth of a page was devoted, under the caption of "Builder's Answers", to company comments on nine alleged defects. Three specific hull problems found in company–built boats–splitting of the bow, cracking of the keel, and water seepage into the balsa wood core between fiberglass layers–occupied the second article. A month later, on January 23 and 25, 1978, two more stories reported alleged defects that may have played a part in the sinking of two company–built boats on January 17 and 20. On January 26, the *Globe* carried an article in which the captain of one of the sunken vessels denied the company's claim that clogged scuppers were the cause, and gave the crew's opinion that the boat's skeg had separated from the bottom.

After the company complained to the *Globe* of distortions and inaccuracies, a final article was published in April of 1978, over the byline of the *Globe's* "Ombudsman", reviewing Coughlin's reporting of problems with 37 company–built boats, finding it "legitimate news" and fairly written, but noting matters that had come to light that were more favorable to the company and concluding that definitive answers were yet to be awaited.

The company, unsatisfied, brought suit on August 18, 1978. Count I sounds in negligence; Counts II and III allege intentional and malicious libel.[1] The prayer for relief seeks ten million dollars, costs, expenses, and attorney's fees. Discovery on the part of plaintiff ensued, resulting in the production by the *Globe* of some 1500 pages in 66 file folders of notes of the reporter Coughlin, but not including notes containing the names of and some information from three sources who were said to have given information in the expectation that their identity would be kept in confidence. A lengthy deposition of Coughlin revealed no information as to the role these sources had played in the series of *Globe* stories. In answering interrogatories the *Globe* stated that it would not rely at trial on any documents as to which a claim of confidential source is made. It acknowledged that there are reports, tests, or evaluations among such documents.

The district court, in responding to the *Globe's* motion to dismiss, took note of the efforts of the Supreme Court "to accommodate the First Amendment's guarantee of a free press with the competing interest which States have in protecting the reputation of natural persons", from *New York Times Co. v. Sullivan, supra,* to *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Its essential reasoning and ruling were as follows:

"The crucial inquiry here is whether corporations, for purposes of the First Amendment, are more akin to public figures or private individuals. In the two key respects outlined in *Gertz,* corporations appear more like public figures. First, corporations often enjoy greater access to the channels of communication than do private individuals. Second, and more importantly, by engaging in the business of selling products, corporations voluntarily place before the public an issue of some importance regarding the quality and integrity of their products. In addition, corporations generally promote the sale of their products to the public by engaging in some form of advertising. Thus, at least to the extent that allegedly defamatory publications relate to the quality of the products which a corporation markets, I rule that corporations should be treated as public figures. *Trans World Accounts, Inc. v. Associated Press,* 425 F.Supp. 814 (N.D. Cal.1977); *Reliance Insurance Co. v. Bar-*

---

1. Another count related to the company's president and is not relevant to these appeals.

*ron's,* 442 F.Supp. 1341, 1348–49 (S.D.N. Y.1977)."

Since all of the *Globe's* articles related to the quality of the company's products, plaintiff fitted within this context. The court dismissed the Count based on mere negligence and entered final judgment under Fed.R.Civ.P. 54(b).

Next, in dealing with plaintiff's request to compel discovery, the court drew on *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), which had declined, in a defamation suit by a public figure, to add to plaintiff's burdens by precluding inquiry into the editorial process. The district court also relied on *Garland v. Torre,* 259 F.2d 545 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), and adopted its prudential guidelines predicating disclosure of a confidential source on criticality of the information sought to plaintiff's claim, non–availability of the information from other sources, and non–frivolousness of plaintiff's cause of action. Finding these requirements satisfied, the court compelled disclosure of the confidential sources and the information derived therefrom. It certified an interlocutory appeal under 28 U.S.C. § 1292(b).

## I. PUBLIC FIGURE

Before *New York Times v. Sullivan, supra,* defamation law strongly favored the state's interest in protecting reputation, approached strict liability, and gave little room to First Amendment considerations. Once a plaintiff put into evidence a reputation–harming statement and proof that defendant caused it to be disseminated, he enjoyed an irrebuttable presumption of injury and a rebuttable presumption of falsity. Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer,* 61 Va. L.Rev. 1349, 1353 (1975) (hereinafter "Ea-

ton"). In 1964 the Court in *New York Times* significantly changed the balance. It recognized, in Madison's phrase, that "[T]he censorial power is in the people over the Government", 376 U.S. at 275, 282, 84 S.Ct. at 721, 727; that keeping this power free of fetters called for "uninhibited, robust, and wide open" debate on public issues, *id.* at 270, 84 S.Ct. at 720; and that, since "erroneous statement is inevitable in free debate", even such a statement must be protected to a greater extent than was afforded by the mere defense of truth. *Id.* at 271–72, 84 S.Ct. at 721. Consequently, the Court held, public officials, in order to prevail in defamation suits, must establish "actual malice". Furthermore, not only must such knowledge of falsity or reckless disregard of truth be established but it must be established by clear and convincing proof.[2]

It is relevant to our deliberations to recognize the almost decisive amplitude of "breathing space" surrounding defamatory falsehood, once a plaintiff is obliged to meet the *New York Times* standard. One commentator concludes that "[T]he constitutional privilege [recognized in *New York Times*] in practical effect became a near–immunity from defamation judgments." Eaton, *supra,* at 1373. The Court in *Gertz, supra,* uses only slightly less emphatic language:

"This standard administers an extremely powerful antidote to the inducement to media self–censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test." 418 U.S. at 342, 94 S.Ct. at 3008.

---

**2.** This standard originated as "convincing clarity" in *New York Times, supra,* 376 U.S. at 285–86, 84 S.Ct. at 728–29, and became "clear and convincing proof" in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 30, 91 S.Ct. 1811, 1813, 29 L.Ed.2d 296 (1971), and so remains. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342,

94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). Moreover, the proof must be that the utterer or publisher acted with a "high degree of awareness of probable falsity", *id.* at 332, 94 S.Ct. at 3003, quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

In cases subsequent to *New York Times*, the Court has varied its formulations of underlying policy and has first expanded, then shrunk the quantum of deference to First Amendment considerations. In *Rosenblatt v. Baer*, 383 U.S. 75, 85–86, 86 S.Ct. 669, 675–676, 15 L.Ed.2d 597 (1966), the term "public official" was declared to include at least those in the hierarchy of government employees "who have, or appear to have, substantial responsibility for or control over the conduct of governmental affairs." In the following year, *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended "public official" requirements of proof to nonofficial "public figures", in this case a famous football coach. The widening of the area subject to the *New York Times* standard reached its outermost limits in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). In this case the Court, sharply divided, subjected to the "actual malice" standard a defamation plaintiff who was neither a public official nor a public figure but a magazine distributor who had been arrested for distributing obscene literature in the course of a law enforcement drive, had been labelled a "smut merchant", and subsequently was acquitted. The linchpin of analysis had become, in the opinion of the plurality, simply "whether the utterance concerns an issue of public or general concern." *Id.* at 44, 91 S.Ct. at 1820.[3]

This pronouncement lasted some three years, until in 1974 in *Gertz, supra*, the Court decided that "The extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest [in protecting the reputation of a private individual] to a degree that we find unacceptable." 418 U.S. at 346, 94 S.Ct. at 3010. The Court noted the additional difficulty of plunging judges into the business of deciding which issues were or were not of "general or public interest". *Id.* While thus easing the task of the defamed private plaintiff, the Court established a higher threshold of liability for statements by publishers and broadcasters by precluding states from imposing liability without fault. It also barred punitive damages absent a showing of knowledge of falsity or reckless disregard for the truth. Having reached what it deemed the correct accommodation of the competing debate and reputation values at stake, the Court proceeded to endeavor to lay down a broad rule, which would preclude an ad hoc balancing of competing interests in each case.

It began by noting, without significant emphasis, that one factor usually distinguishing public officials and public figures was the remedy of self–help, "significantly greater access to the channels of effective communication ... and ... a more realis-

---

**3.** Because the rationale of *Rosenbloom* was rejected in *Gertz* and because the arguments made by the *Globe* in the case at bar so closely track that rationale, we think it well to set forth the gist of the *Rosenbloom* decision:

"Self–governance in the United States presupposes far more than knowledge and debate about the strictly official activities of various levels of government ... [I]n private hands [are] vast areas of economic and social power that vitally affect the nature and quality of life in the Nation ... 'Freedom of discussion ... must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' *Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940)". 403 U.S. at 41, 91 S.Ct. at 1818.

"If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is in-

volved, or because in some sense the individual did not 'voluntarily' choose to become involved ... We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." *Id.* at 44–45, 91 S.Ct. at 1820.

"Further reflection over the years since *New York Times* was decided persuades us that the view of the 'public official' or 'public figure' as assuming the risk of defamation by voluntarily thrusting himself into the public eye bears little relationship either to the values protected by the First Amendment or to the nature of our society." *Id.* at 47, 91 S.Ct. at 1821. "Voluntarily or not, we are all 'public' men to some degree." *Id.* at 48, 91 S.Ct. at 1822.

tic opportunity to counteract false statements than private individuals normally enjoy." *Id.* at 344, 94 S.Ct. at 3009. In the same breath the Court acknowledged that "an opportunity for rebuttal seldom suffices to undo harm of defamatory falsehood." *Id.* n. 9.

The Court then delineated three major classes of public figures. The first included persons who have "assumed roles of especial prominence in the affairs of society", *id.* at 345, 94 S.Ct. at 3009, or who have achieved "pervasive fame or notoriety", *id.* at 351, 94 S.Ct. at 3012, as well as those who "occupy ... positions of ... persuasive power and influence", *id.* at 345, 94 S.Ct. at 3009, or are "pervasive[ly] involve[d] in the affairs of society." *Id.* at 352, 94 S.Ct. at 3013. Such persons are considered public figures for all purposes. A second class envisaged might consist of those who become public figures through no purposeful action, "but the instances of truly involuntary public figures must be exceedingly rare." *Id.* at 345, 94 S.Ct. at 3009. The third class, the relevant one for the purposes of this case, is constituted of persons who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 345, 94 S.Ct. at 3009. These persons are public figures for a limited range of issues. The Court gave guidance as to this category: "It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013.

In *Gertz*, the plaintiff was a lawyer for a family seeking civil damages from a policeman for the killing of a son. A periodical of the John Birch Society, exercised over the criminal prosecution of the policeman, charged that plaintiff played a part in framing the policeman, falsely labelled plaintiff a "Leninist", "Communist–fronter", and planner of attacks on the police, and implied, falsely, that he had a criminal record. Despite the fact that plaintiff, a Chicagoan, had been an officer of civic groups and professional organizations, and had published several legal books and articles,[4] the Court observed that he had had nothing to do with the criminal prosecution and had never discussed either the civil or criminal litigation with the press. "He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." *Id.* at 352, 94 S.Ct. at 3013.

With *Gertz*, tinkering with the doctrinal balance struck between protecting uninhibited debate and protecting reputations seems to have ceased, at least for the present. The subsequent Supreme Court cases have, however, added a gloss in applying doctrine to specific cases. In *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Court had occasion to deal with a plaintiff who, to use the *Gertz* lexicon, had prominence, fame, and notoriety. A prominent member of Palm Beach society, she had gained even more publicity as the result of hotly contested divorce proceedings. The Court, however, stopped at the threshold, declining "to equate 'public controversy' with all controversies of interest to the public." *Id.* at 454, 96 S.Ct. at 965. Marital difficulties, even among the wealthy, did not qualify, and plaintiff had not (despite holding some press conferences "to satisfy inquiring reporters") publicized issues bearing on her married life. *Id.* at 454–55, 96 S.Ct. at 965.

In *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), plaintiff had, in the late 1950's, failed to respond to a grand jury subpoena in a major Soviet spy ring investigation, pleaded guilty to a contempt charge, and

---

4. Apparently Gertz's activities were even more widespread than revealed in the Court's opinion. According to his affidavit he had authored four books and "thousands" of articles in legal, historical, and literary publications, had been the subject of forty articles in Chicago papers, and had made many television and radio appearances. *Schultz v. Reader's Digest Ass'n*, 468 F.Supp. 551, 558 (E.D.Mich.1979), *quoting from* Robertson, *In Praise of Gertz v. Robert Welch, Inc.*, 54 Tex.L.Rev. 199, 222 (1976).

received a suspended sentence. In a 1974 publication, plaintiff was referred to as a Soviet agent. The Court held that plaintiff's voluntary choice not to appear before the grand jury, even knowing that publicity would result, was not enough to make him a public figure. Merely being associated "with a matter that attracts public attention", absent any attempt to engage the attention of the public to influence the resolution of issues involved, was "no basis whatsoever for concluding that petitioner relinquished, to any degree, his interest in the protection of his name." *Id.* at 167–68, 99 S.Ct. at 2708. Nor does a prior conviction "create an 'open season' for all who sought to defame persons convicted of a crime." *Id.* at 169, 99 S.Ct. at 2708.

The last in the series, *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), concerned a plaintiff who was a research behavioral scientist mentioned unfavorably in connection with Senator Proxmire's "Golden Fleece of the Month" award to governmental agencies that had sponsored his research. Notwithstanding the facts that plaintiff had applied for and received funds from several federal and state agencies for his research in the amount of nearly half a million dollars over seven years and had filed required reports with at least one federal agency, the Court reasoned that any publicity came as a result of, and after, the Golden Fleece Award, that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.", *id.* at 135, 99 S.Ct. at 2688, that he did not thrust himself into controversy to influence others, that concern over public expenditures was not enough to make plaintiff a public figure, that he had not attained any "role of public prominence in the broad question of concern about expenditures", and finally, that he "did not have the regular and continuing access to the media that is one of the accouterments of having become a public figure." *Id.* at 135–36, 99 S.Ct. at 2688.

Although few generalizations can safely be promulgated, this review of *Gertz* and post–*Gertz* cases seems to warrant the comment of one scholar that: "A fairly high threshold of public activity is evidently necessary for a finding that a person has voluntarily plunged into a public controversy." L. Tribe, American Constitutional Law 645 (1978). Moreover, the detailed, fact–sensitive nature of the precedent indicates that particularized determinations of public figure status are the rule. Accordingly, we begin our analysis by adopting a different approach from that of the district court, which took the broad position of deeming all corporations that sell products public figures, at least in relation to allegedly defamatory statements made about the quality of their products. We recognize the attraction of broad and clearcut definitions in terms of simplifying litigation, but we cannot see how corporations as a class can be said to be "public figures" for First Amendment purposes. For the most part, libel cases involving corporate plaintiffs, including the cases relied on by the district court, have not been decided on the broad grounds that all corporations are public figures. *See, e. g., Trans World Accounts, Inc. v. Associated Press,* 425 F.Supp. 814 (N.D. Cal.1977). Indeed, not all such plaintiffs have been found to be public figures. *See Vegod Corp. v. American Broadcasting Companies, Inc.,* 25 Cal.3d 763, 160 Cal.Rptr. 97, 603 P.2d 14 (1980). To the extent that access to the channels of communication is a meaningful factor,[5] we suspect that many, if not most, corporations have no particular advantage over private individuals. The more significant factor of "thrusting", here presumably by means of promotional efforts, is no less vulnerable to any effort to generalize.[6] And the mere selling of prod-

5.  *Cf. Reliance Ins. Co. v. Barron's,* 442 F.Supp. 1341, 1348 (S.D.N.Y.1977) ("The 'access to media' argument is no more than a makeweight.")

6.  The following generalization, from the *Globe's* brief, is an example:

"[I]n advertising the product and in undertaking promotional efforts designed to convince the public that, for whatever reason, the product being sold is the one they should buy, the corporate vendor necessarily takes purposeful action which places it in the pub-

ucts itself cannot easily be deemed a public controversy.

The only case that supports the district court's approach rests upon an assumption that a corporation's interest in protecting its reputation is less important than that of an individual person. *Martin Marietta Corp. v. Evening Star Newspaper*, 417 F.Supp. 947 (D.D.C.1976). We know of no support in New Hampshire libel law—the applicable substantive law in this diversity action—for such an assumption, and doubt that the damages awarded in various libel actions are consistent with this view. In any event, the assumption's implications are certainly overbroad within the context of the constitutional issue presented, for they would suggest that any plaintiff, whether a corporation, unincorporated business, sole proprietorship, or even a private individual, would have to meet the public figure's burden of proof wherever the aspects of the plaintiff's reputation that was allegedly damaged were economic or pecuniary, as opposed to personal.

We shall therefore follow a more particularized approach. Our first task, following the guidance of *Firestone*, is to determine whether there was "the sort of public controversy referred to in *Gertz*", 424 U.S. at 454, 96 S.Ct. at 965. Distinguishing what would be "an issue of public or general concern" under *Rosenbloom, supra*, 403 U.S. at 44, 91 S.Ct. at 1820, from a "public controversy" under *Gertz* is not a clearcut task. To the extent that we distinguish, we find ourselves returning to the job from which the Court in *Gertz* felt it had liberated us.[7]

■ The *ipse dixit* in *Firestone* that marital difficulties even of the wealthy were not matters of public controversy is understandable as an instinctive reaction that the public can have no interest other than satis-

faction of its curiosity in the outcome of a divorce proceeding. The mere fact that the immediate proceeding is between private individuals, however, does not guarantee that there could be no public controversy. A court proceeding to authorize the termination of provision of life support equipment to an infant or ward might, for example, be the center of a public controversy.

A case closer to the facts before us, i. e., a case involving commercial operations, is *Vegod Corp. v. American Broadcasting Companies, Inc., supra.* Plaintiff corporation engaged in the business of closing out stores and was allegedly defamed. The California Supreme Court, while conceding that the quality of goods for sale was a matter of public interest, held:

"Criticism of commercial conduct does not deserve the special protection of the actual malice test. Balancing one individual's limited First Amendment interest against another's reputation interest (*Herbert v. Lando* (1979) 441 U.S. 153, 169, 99 S.Ct. 1635, 1645, 60 L.Ed.2d 115 ...), we conclude that a person in the business world advertising his wares does not necessarily become part of an existing public controversy. It follows that those assuming the role of business practice critic do not acquire the First Amendment privilege to denigrate such entrepreneur." (Footnote omitted.) 25 Cal.3d at 770, 160 Cal.Rptr. at 101, 603 P.2d at 18.

To the extent that this language can be read as insulating all advertising and pro-business promotional efforts from public controversies, it is probably overbroad. Even though the need for "breathing space" to safeguard and ensure lively discussion of public issues originated in matters relating to governance, we can contemplate public controversies arising from com-

lic spotlight just as squarely as does the effort of a candidate to get himself elected to a public office."

Although such a statement might arguably apply to a major automobile manufacturer, the same could not be said of an incorporated (or unincorporated) "Mom and Pop" store that advertises to some extent.

7. "Now judges are asked to determine whether a controversy is 'public,' [ ] a determination indistinguishable to the naked eye from whether the subject matter is of public or general concern." L. Tribe, American Constitutional Law (1978), at 644.

mercial conduct as the cases we now discuss indicate.

A starting point more fruitful than cataloguing the field of action in which the alleged public controversy is found is inquiry as to whether the controversy preceded the alleged defamation. *Gertz's* requirement that in order for individuals, otherwise not famous or pervasively influential, to merit public figure status, they must "have thrust themselves to the forefront of particular public controversies" would seem to imply a pre–existing controversy. This implication is reinforced by the stricture that "Those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire, supra,* 443 U.S. at 135, 99 S.Ct. at 2688. *See also Waldbaum v. Fairchild Publications,* 627 F.2d 1287, 1295 n.19 (D.C.Cir. 1980). Thus, even in the case so strongly relied upon by the *Globe, Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3d Cir. 1980), where plaintiff complained about television broadcasts highly critical of the price and quality of plaintiff's meat products, both the television stations and the Bureau of Consumer Affairs had, well before the broadcasts, received numerous telephone complaints from consumers. *Id.* at 273–74.

In *Trans World Accounts, Inc. v. Associated Press,* 425 F.Supp. 814 (N.D.Cal.1977), the plaintiff corporation, engaged in debt collecting, claimed to be libelled by erroneous reports of an impending Federal Trade Commission complaint against it. Plaintiff was held to have become a public figure not because of the alleged defamatory newspaper stories, but because an "integral feature of the Commission's enforcement effort . . . [was] the publicity which attends the issuance of proposed complaints", the purposes being both to warn consumers and to induce prompt compliance with remedial orders. *Id.* at 820. *See also Orr v. Argus–*

*Press Co.,* 586 F.2d 1108 (6th Cir. 1978) (prior criminal proceeding); *Hoffman v. Washington Post Co.,* 433 F.Supp. 600 (D.D. C.1977) (prior Federal Trade Commission proceeding).

In the instant case the record reveals no public controversy antedating the publication of the *Globe* articles. The articles report that a number of owners of company–built boats had had unhappy–or worse–experiences but we know little or nothing of ongoing private controversies, not to mention public ones. This case is to be contrasted with one where "persons actually were discussing some specific question . . . [and] a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Waldbaum v. Fairchild Publications, Inc., supra,* 627 F.2d at 1297 (footnote omitted).

■ Even if it could be said that a prior public controversy existed, a second task of analysis is to look "to the nature and extent of [the plaintiff's] participation in the particular controversy giving rise to the defamation." *Gertz, supra,* 418 U.S. at 352, 96 S.Ct. at 3013. Wholly apart from a prior controversy, there is a consistent strain of inquiry in which the Court looks to see if a plaintiff, caught involuntarily in a proceeding, nevertheless exercises his volition in an effort to "engage the public's attention in an attempt to influence [the] outcome." *Id., Firestone, supra,* 424 U.S. at 454, n. 3; 455, 96 S.Ct. at 965; *Proxmire, supra,* 443 U.S. at 135, 99 S.Ct. at 2688; *Wolston, supra,* 443 U.S. at 167,[8] 99 S.Ct. at 2708.

The meager facts to be extracted from the complaint at bar reveal no suggestion of a "thrusting into the vortex". Prior to the publication, we know only that the company had steadily, over seven years, increased its production tenfold, from eight to ninety a year. We know absolutely nothing of its

---

**8.** *See also Littlefield v. Fort Dodge Messenger,* 614 F.2d 581, 584 (8th Cir. 1980) (plaintiff attorney's voluntary action in practicing law in violation of his probation, the basis for an allegedly defamatory news story, held not to indicate that attorney "did so out of a desire to influence any public controversy."); *Mills v. Kingsport Times–News,* 475 F.Supp. 1005 (W.D.Va.1979) (plaintiff's participation in newsworthy preliminary hearing as person charged with murder of her husband held not sufficient to make her a public figure).

promotional efforts, either in scale or nature. This record is to be contrasted with the concentrated "advertising blitz" which the Third Circuit held "invited public attention, comment, and criticism" in *Steaks Unlimited, supra,* at 274. *See also Waldbaum v. Fairchild Publications, Inc., supra,* 627 F.2d at 1300 (activist president of large cooperative, "mover and shaper of many of the cooperative's controversial actions", engaged in promotional activities projecting own image and that of cooperative); *Yiamouyiannis v. Consumers Union of the United States, Inc.,* 619 F.2d 932 (2d Cir. 1980) (plaintiff was active opponent of fluoridation, had written 15 articles, testified in Congress, was paid employee of leading antifluoridation promotional organization, obtained wide publicity for himself and his views).[9]

Based on the record before us, what we appear to face in the case at bar is the paradigm middle echelon, successful manufacturer–merchant. While the company is recognized in its field and in its area, if such activity and success were alone sufficient to make it a public figure, virtually every entrepreneur, however parochial, who has avoided bankruptcy might also qualify. If it be suggested that only those who dominate or lead in a market be so designated, the courts would be thrust into the same sort of market and product analysis as occupies to such a large extent the antitrust field. If the plaintiff were to be deemed a public figure on the basis of the record before us, so might be, equally successful individuals, and so might be, we suggest, sellers of services as well as goods. At this point the law of defamation would largely be obliterated.

The *Globe,* in language reminiscent of *Rosenbloom, see* n. 3 *supra,* argues that "Issues concerning the reliability of a product, the quality of a product, the utility of a

product, and the safety of a product thus may well be just as important to the continued operation of a sound capitalistic democracy as issues concerning the fitness of an individual to hold public office." Discounting a bit for hyperbole, we grant that today the interest of the consumer is taking on increased importance. Consumer–oriented legislation, agencies such as the Federal Trade Commission and the Food and Drug Administration, and the common and statutory law of product liability testify to and implement this newly recognized value in our society. But we do not feel justified in adding to the armament by declaring all reasonably successful manufacturers and merchants (and professionals) to be, without more, "public figures" in their community and obliged to prove "actual malice" to vindicate any maligning of their names and reputations.

■ We therefore conclude that the *Globe* has not, on this limited record, met its burden of establishing that the company is a public figure. Its motion to dismiss was improperly granted. This is not to say that under no circumstances could the *Globe* meet that burden. On remand it is not foreclosed from attempting to introduce additional evidence to satisfy the standard. It will then be for the district court, on a fuller record, to determine whether a public controversy implicating the company existed apart from the challenged statements (or, perhaps, whether the likelihood of harm was such that public controversy was highly probable); and whether the prominence, power, or involvement of the company in respect to the controversy–or its public efforts to influence the results of such controversy–were such as to merit public figure treatment. Such questions as the extent to which the threshold of reputation protection depends upon the nature of the industry must await the completion of a more

---

9. So also is the present case a far remove from a case like *Reliance Insurance Co. v. Barron's, supra,* where a billion dollar, publicly held corporation, subject to federal and state regulatory bodies, proposing a fifty million dollar stock offering, was held to be a public figure in its suit against *Barron's Financial Weekly* arising out of an article impugning the plaintiffs' motives. The court having found *Reliance* a public figure for all purposes because of its size, public ownership, and close regulation, added that its stock offering had also made it a public figure for the limited purposes of the *Barron's* article.

particularistic inquiry and argument directed thereto.

## II. DISCLOSURE OF CONFIDENTIAL SOURCES

The *Globe's* appeal is from the granting of plaintiff's motion to compel answers to certain questions at deposition and to require production of certain documents. The documents and questions relevant to this appeal relate to the identity of and information imparted by three individuals who assertedly served as "confidential sources" for the *Globe* reporter. While it is not apparent from the record how many persons served as sources, the three "confidential" sources were clearly few among many non–confidential sources. The reporter's deposition and the allegedly defamatory articles identify many named sources and the *Globe* proffered during discovery approximately 1500 pages of handwritten reporter's notes in some 66 files.

The record is sparse with respect to the nature of the confidential information withheld. One document was an apparently unsolicited letter to the *Globe*. A *Globe* editor passed the letter on to reporter Coughlin, thereby initiating research on the Bruno & Stillman story. The reporter subsequently spoke with the author of the letter, and at his request promised him confidentiality with respect to all information imparted.[10] Two other persons were asserted to be confidential sources. With respect to all three individuals, the motion to compel sought no more than withheld reporter's notes which named the sources:

**10.** From plaintiff's counsel's interrogatories and questioning at the deposition, it appears that he believes this source to be one Duffy, a former Bruno & Stillman employee. And during his argument against certification of this interlocutory appeal, counsel stated: "I could have, by a lot of sidewise kind of discovery, eventually discovered who these people are. In fact, I know who one of the confidential sources is." In the course of questioning the reporter about admitted conversations with Duffy, counsel asked if Duffy had produced a list of boats as to which warranty claims had been filed. The reporter refused to answer

"Mr. Nix [plaintiff's counsel]: . . . in addition to simply naming the three people, do those notes contain other information which bear on the factual investigation which went into the Bruno and Stillman articles?

"Mr. McHugh [defendant's counsel]: Those notes contain information imparted to Mr. Coughlin by one or more of those three people."

The *Globe* also answered "yes" to an interrogatory asking whether "there are any reports, tests or evaluations among the documents claimed to be covered by the 'confidential sources.'" Evidently the reporter's notes sought contain or would lead to discovery of such "reports, tests or evaluations."

No specific reasons for the basis of the confidentiality claim shielding these two sources appears in the record. However, the following colloquy occurred during questioning about a source whom the reporter did not treat as confidential:

"Q. Do you have a policy as to when you consider sources confidential and when you don't?

A. Yes, sir.

Q. Can you explain to me what that is?

A. It's when I tell them I don't so treat them.

Q. Fair enough. When you tell someone that you will treat them confidentially, that is when it is confidential to you?

A. Yes, sir.

Q. But when a witness says to you this is confidential, and you don't say it back to them, it's not confidential? You don't treat it as confidential?

"[b]ecause it would lead to confidential material." "Q. So obviously Mr. Duffy is one of your confidential witnesses, is that so? A. I decline to answer that."

In addition, defendant refused to produce "originals or copies of documents written or created by current or former employees of Bruno & Stillman, Inc., or Richard Bruno", "on the grounds that production of said documents may lead to the disclosure of a source who provided information to defendant in confidence." From all this, we take it that plaintiff regards Duffy as the source whose identity it knows.

A. Not necessarily.

Q. Not necessarily? That is up to you to decide?

A. Yes, sir."

The *Globe* asserts a conditional privilege on its part to refuse to disclose a reporter's confidential source until the party seeking disclosure establishes generally that the public interest in disclosure is compelling enough to override the disruption or threat to the continued free flow of information to the media by showing specifically that (1) the information sought is critical to plaintiff's claim and (2) the information is not available from other sources.

Whether or not such a privilege is available to a defendant in a civil defamation case where the plaintiff is not a public figure is a question left open by recent Supreme Court precedent. *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), denied such a privilege to a reporter called as a grand jury witness in a criminal investigation. *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), the only Supreme Court case directly discussing the use of discovery procedures in libel suits, required defendants in a libel suit brought by a public figure to answer questions directed to the state of mind of editors preparing a broadcast. In both cases the generally compelling need for disclosure was obvious. In *Branzburg* the importance of the role of the grand jury in investigating crime was implicated, 408 U.S. at 700–701, 92 S.Ct. at 2666. In *Herbert* the Court noted the substantial burden upon a public figure to prove "the ingredients of malice" with "convincing clarity", 441 U.S. at 170, 174, 99 S.Ct. at 1646, and the information sought went directly to the state of mind of the editor.

In each case, however, the Court did refer to situations presenting other and less compelling needs. In *Branzburg*, the Court, although dealing only with a request by a grand jury, pointed to the disclosure of sources in civil cases, 408 U.S. at 702, 92 S.Ct. at 2667. In *Herbert*, the Court indicated that its rationale concerning the discovery needs of a public figure plaintiff applied also to cases where plaintiff's burden is only to prove "some degree of culpability", 441 U.S. at 172, 99 S.Ct. at 164; *see also id.* at 174, 176, 99 S.Ct. at 1648–49. Yet, despite this refusal to give doctrinal recognition to any automatic, categorical, across-the-board privileges, in neither case did the Court suggest the opposite, that the interests underlying the asserted privileges were *a priori* and by definition beyond the pale of any protection.

In *Branzburg*, the opinion of Mr. Justice Powell, needed to make a majority, stressed that "The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." 408 U.S. at 709, 92 S.Ct. at 2671. He added:

"If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." *Id.* at 710, 92 S.Ct. at 2671. (Footnote omitted.)

In *Herbert*, the Court's opinion concluded by stressing the availability, in the Rules of Civil Procedure, of "ample powers of the district judge to prevent abuse." 441 U.S. at 177, 99 S.Ct. at 1649. Specifically, the Court noted:

"[T]he requirement of Rule 26(b)(1) that the material sought in discovery be 'rele-

vant' should be firmly applied, and the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .' Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process."

To this Mr. Justice Powell added a thought that he deemed consistent with the Court's opinion, "That, in supervising discovery in a libel suit by a public figure, a district court has a duty to consider First Amendment interests as well as the private interests of the plaintiff." *Id.* at 178, 99 S.Ct. at 1650. Although he conceded that in *Herbert* First Amendment rights warranted no constitutional privilege, he emphasized that those rights must be "weighed carefully in striking a proper balance." *Id.* at 180, 99 S.Ct. at 1651.[11]

It thus seems clear that in both cases the First Amendment concerns articulated by the parties asserting privileges were in fact taken into consideration by the Court, but found to be outweighed in the contexts of those cases. This kind of fact–sensitive approach comports with the shifting weights of the competing interests. Although the discovery needs of a non–public figure plaintiff are generally less than those of a grand jury or a public figure, this is not always true. Such a plaintiff may be seeking punitive damages and thus held to the actual malice burden of proof. Also, it can be argued that if a plaintiff is not even a limited public figure, the public interest in keeping open the flow of information to the press usually diminishes. Yet generalizations are dangerous; there may be cases where revelation of sources will threaten physical or other harm that will be quite disproportionate to a plaintiff's litigation needs.

■ Whether or not the process of taking First Amendment concerns into consideration can be said to represent recognition by the Court of a "conditional", or "limited" privilege is, we think, largely a question of semantics. The important point for purposes of the present appeal is that courts faced with enforcing requests for the discovery of materials used in the preparation of journalistic reports should be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights.[12] In determining what, if any, limits should

---

11. He elaborated on this weighing process as follows:

"Under present Rules the initial inquiry in enforcement of any discovery request is one of relevance. Whatever standard may be appropriate in other types of cases, when a discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated. On the one hand, as this Court has repeatedly recognized, the solicitude for First Amendment rights evidenced in our opinions reflects concern for the important public interest in a free flow of news and commentary. See *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 781–783 [98 S.Ct. 1407, 1418–1419, 55 L.Ed.2d 707] (1978); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 862–863 [94 S.Ct. 2811, 2821, 41 L.Ed.2d 514] (1974) (Powell, J., dissenting). On the other hand, there also is a significant public interest in according to civil litigants discovery of such matters as may be genuinely relevant to their lawsuit. Although the process of weighing these interests is hardly an exact science, it is a func-

tion customarily carried out by judges in this and other areas of the law. In performing this task, trial judges–despite the heavy burdens most of them carry–are now increasingly recognizing the 'pressing need for judicial supervision.' *AFC Industries, Inc. v. EEOC, supra* [439 U.S. 1081], at 1087 [99 S.Ct. 865, at 869, 59 L.Ed.2d 52].⁴"

"⁴ In some instances, it might be appropriate for the district court to delay enforcing a discovery demand, in the hope that the resolution of issues through summary judgment or other developments in discovery might reduce the need for the material demanded. It is pertinent to note that respondents here had not sought summary judgment on any issue at the time discovery was opposed, and have not argued that discovery should be postponed until other issues on which liability depends are resolved." 441 U.S. at 179–180, 99 S.Ct. at 1650–1651.

12. These rights, while lodged in the reporter and his publisher, in reality reflect an underlying interest of the public. As the late Alexander M. Bickel put it, "The issue is the public's right to know. That right is the reporter's by

accordingly be placed upon the granting of such requests, courts must balance the potential harm to the free flow of information that might result against the asserted need for the requested information.[13]

The relevant authority dealing with civil discovery requests for confidential sources is for the most part consistent with such an approach. *Compare Garland v. Torre*, 259 F.2d 545 (2d Cir.), *cert. denied*, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958) *with Baker v. F. & F. Investment*, 470 F.2d 778 (2d Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973). *See also Carey v. Hume*, 492 F.2d 631, 636 (D.C.Cir. 1974) ("court will look to the facts on a case–by–case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired."); *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973) ("But to routinely grant motions seeking compulsory disclosure of anonymous news sources without first inquiring into the substance of a libel allegation would utterly emasculate the fundamental principles that underlay the line of cases articulating the constitutional restrictions to be engrafted upon the enforcement of State libel laws."); *Miller v. Transam. Press, Inc.*, 621 F.2d 721 (5th Cir. 1980).

Most recently, in summing up these various precedents, the Court of Appeals for the Third Circuit concluded "that journalists have a federal common law privilege, albeit qualified, to refuse to divulge their sources". *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir. 1979). As added authority for this holding, the court pointed to the language and legislative history of Rule 501 of the Federal Rules of Evidence. *Id.* at 713–14. The court noted in particular that

the flexibility of Rule 501 left ample room for the development of a finely honed, *"ad hoc"* approach, *id.* at 715, whereby courts might strike a "delicate balance between the assertion of the privilege on the one hand and the interest of either criminal or civil litigants seeking the information . . . ." *Id.* at 716.

We therefore conclude that the resolution of the discovery issue in this appeal does not lie in any black letter pronouncement or broad scale confrontation between First Amendment and reputation interests. This case seems to us an example documenting the observation by the late Professor Bickel that

"[T]he Court has exacted the strictest, even the extraordinary observance of legislative, judicial, and administrative procedures, to the end of moderating or avoiding a clash with First Amendment values. The Court has, as occasion offered, devised special procedures tailored to this end. The upshot, happily, is that a whole series of defensive procedural entrenchments lie between the First Amendment and interests adverse to it. Hence the direct, ultimate confrontation is rare and when it does occur, limited and manageable." *The Morality of Consent*, at 88.

■ Following the lead of Mr. Justice Powell, we find the "special procedures" suitable for this case to be the application of Fed.R.Civ.P. 26 ("General Provisions Governing Discovery") with a heightened sensitivity to any First Amendment implication that might result from the compelled disclosure of sources. The conflicting considerations are contained in the language of the Rule. On the one hand, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter . . . It is not ground for objection

virtue of the proxy which the freedom of the press clause of the First Amendment gives to the press in behalf of the public." *The Morality of Consent*, Yale Univ. Press, 1975, at 85.

**13.** That the Court is, if anything, more hospitable to this approach than ever, we conclude from *Richmond Newspapers, Inc. v. Virginia*, —— U.S. ——, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The Court's reference to a "right to

gather information" quoting *Branzburg, supra*, 408 U.S. at 681, 92 S.Ct. at 2656, that "without some protection for seeking out the news, freedom of the press could be eviscerated" seems inescapably to point to the kind of constitutionally sensitized balancing process stressed by Mr. Justice Powell in both *Branzburg* and *Herbert*.

that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). On the other hand, the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: ... (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court; (6) that a deposition after being sealed be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way", Fed.R.Civ.P. 26(c).

■ In applying these provisions to a case in which discovery of sources is sought by a plaintiff who does not have to shoulder the burden of a public figure, the court should consider a number of factors.[14] Initially each party has a burden. The plaintiff must establish relevance of the desired information and the defendant has the burden of establishing need for preserving confidentiality. 8 C. Wright & A. Miller, Federal Practice & Procedure § 2043, at 301–302 (1970).

■ As a threshold matter, the court should be satisfied that a claim is not frivolous, a pretense for using discovery powers in a fishing expedition. In this case, plaintiff should show that it can establish jury issues on the essential elements of its case not the subject of the contested discovery. Here, the falsity of the *Globe's* charges, for example, should be drawn into question and established as a jury issue before discovery is compelled. *Downing v. Monitor Publish-*

*ing Co.,* N.H., 415 A.2d 683, at 686 (1980); *see* 8 C. Wright & A. Miller, *supra,* § 2040, at 288. There may also be, even at an early stage of proceedings, strong indications or contraindications of relevance. *Cf. Cervantes v. Time, Inc., supra,* 464 F.2d at 995 (depositions, affidavits, and other documentary evidence were held to have supported summary judgment that they were published "without actual malice and on the basis of careful verification efforts").

■ Assuming, however, that the case does not appear frivolous, that falsity appears to be a jury issue, and that the desired information appears more than remotely relevant, the court must assess the extent to which there is a need for confidentiality. Not all information as to sources is equally deserving of confidentiality. An unsolicited letter may be received with no mention of an interest in anonymity; such a letter may casually mention the wish for confidential treatment; it may specifically condition use on the according of such treatment; or it may defer communication of any substance until a commitment to confidentiality is received. Oral communications could also range from the cavalierly volunteered to the carefully bargained–for undertaking.[15] In the present case a number of facts need to be sorted out and others developed. For example, although one source sent an unsolicited letter, there was a subsequent promise to protect not only all notes of conversation with the source but the initial letter. Whether and to what extent such a *nunc pro tunc* undertaking merits protection by the court is a matter for its discriminating judgment. The existing record is silent as to the reasonable expectation of confidentiality on the part of the other two sources.

Depending upon the court's assessment of the importance to the defendant's continued

---

**14.** We, of course, do not mean to suggest here that the company will not have to shoulder this burden, an issue still to be decided by the district court, *see* Section I, *supra.* The district court's decision on this issue will bear on its consideration of the factors below and, in particular, on the company's need for the information sought.

**15.** The unsuitability of any general rule is underscored by Bickel, *supra,* at 85: "It is difficult ... to accept that a reporter's First Amendment protection should be tailored to the whim, to the irrational anxiety, the arbitrary edict, the ideological fixation of one or another news source; difficult to accept such a veto over the reporter in the pursuit of his profession, or the government in the discharge of its responsibility to administer justice."

newsgathering effectiveness of preserving the source's confidentiality, the court has a number of options. If the claimed confidentiality seems unsupported, unlikely, or speculative, the court may order discovery. If it is in doubt, it may defer resolution of the confidentiality issue and turn to the relevance issue. It may, for example, conduct an *in camera* inspection of reporters' notes. If such notes did not create an inference of negligence or suggest leads for developing such evidence, it could refuse disclosure. The court might also conclude that disclosure of the sources' names would be most unlikely to lead to relevant evidence.

The court, in cases of continuing uncertainty regarding the weight of plaintiff's need to know and that of defendant's need to preserve confidentiality, has available to it a range of actions that can be tailored to the needs of sensitive balancing. It may defer disclosure, as Mr. Justice Powell suggested in his separate opinion in *Herbert, supra,* n. 11, until more discovery has taken place with the possibility that summary judgment would be appropriate. It could also require that resort to nonconfidential sources first be exhausted. As Judge McGowan observed, in *Carey v. Hume, supra,* 492 F.2d at 638, "The values resident in the protection of the confidential sources of newsmen certainly point towards compelled disclosure from the newsman himself as normally the end, and not the beginning, of the inquiry." [16] The court might order that the notes be sealed, *see* Annotation, 19 A.L. R.Fed. 970 (1974), pending plaintiff's later development of an issue of negligence via discovery of non-confidential information. *Cf. Cervantes v. Time, Inc., supra,* 464 F.2d at 994–95. "An impartial third person may be named to examine the confidential information. Other kinds of conditions may be imposed, limited only by the needs of the situation and the ingenuity of court and counsel." 8 C. Wright & A. Miller, *supra,*

§ 2043, at 307. Another recourse might be a deposition with limited attendance and with dissemination proscribed to others than counsel.

We deliberately refrain from further categorizing with any precision what inquiries should be made by the court or in what sequence. The task is one that demands sensitivity, invites flexibility, and defies formula. While obviously the discretion of the trial judge has wide scope, it is a discretion informed by an awareness of First Amendment values and the precedential effect which decision in any one case would be likely to have. Given the sensitivity of inquiry in this delicate area, detailed findings of fact and explanation of the decision would be appropriate.

In the instant case the district court approximated the balancing approach we have outlined, by relying on the factors identified in *Garland v. Torre, supra* : relevance in an important sense to plaintiff's claim; availability of the information from other sources; and non–frivolousness of the cause of action. The court said:

"I rule that the three factors set forth in *Garland* are satisfied in this case. As to the first factor, the identity of the confidential sources is important and critical to the plaintiff's claim since it appears that the information derived from those sources instigated the *Globe's* investigation and played a central role in the *Globe's* decision to publish the articles about the fishing vessels produced by Bruno & Stillman, Inc. As to the second factor, although it is not clear what efforts the plaintiff has made to secure the identity of the sources elsewhere, I decline to require the plaintiff to conduct extended discovery in an attempt to ascertain the identity of the confidential sources in light of the central role which those sources seem to have played. Finally, as to the third factor, while I ex-

---

16. *See also Riley v. City of Chester, supra,* 612 F.2d at 716; *Baker v. F. & F. Instrument, supra,* 470 F.2d at 784, citing *Garland v. Torre, supra,* 259 F.2d at 550. In the present case, plaintiff's counsel, after the motion to compel was granted, stated in court that he knew one source's name and could discover on his own the other

two. *See* n. 10, *supra.* On remand, after further investigation, the court may decide that such avenues should first be explored, or that circumstances did not justify such further effort, or even that the notes, with all references to the identity of sources excised, might pose no threat to confidentiality.

press no opinion as to the merits of this action, there is nothing in the record before me which indicates that the plaintiff's claim against the *Globe* is patently frivolous."

We observe, however, first, that the ruling was made without the benefit of the large quantity of reporter's notes that had been made available to plaintiff. We have no sense of the picture of need for or role of the sources as revealed by them. Nor have we any analysis of the commitment to confidentiality pertaining to various sources. More importantly, the court based its judgment of relevance of the identity of confidential sources largely on the apparent fact that such sources "instigated" the *Globe's* investigation. What is relevant, however, is evidence bearing on the reporter's negligence, not evidence of causality in publication. This misconception—that "instigating" was a "central role"—infected the court's decision not to require the plaintiff to pursue other avenues, which plaintiff felt may have yielded the desired information, see n. 9, *supra*.[17] Finally, the court apparently relied in part upon its finding that the plaintiff was a public figure and had to prove "actual malice", a finding that we reverse in this opinion.

In short, our criticism is that the balancing process was not conducted with sufficient awareness of the contesting values, the factors to be considered, and the options available to the court. This is hardly a criticism of the district court, which had to act without the benefit of any guidance tailored to the case at hand. We therefore remand the case for reconsideration of the plaintiff's motion to compel discovery in light of our discussion.

*The judgment in No. 80–1173 is reversed; the order in No. 80–1172 is vacated, and the cause remanded for further proceedings consistent with this opinion. No costs.*

---

**17.** We take no exception to the court's finding that plaintiff's claim is not frivolous. Such a finding, while correct, does not terminate the sensitive balancing process.