EBEL, Circuit Judge,
dissenting.
Plaintiff-Appellant Kameisha Hamilton claims Defendants fired her because of her race. Defendants — Boise Cascade Express and three of its managerial employees — assert that they, instead, terminated Hamilton’s employment because they believed, in good faith, that Hamilton had committed time card fraud. The district court granted Defendants summary judgment. The specific question before this court now on appeal, therefore, is whether Hamilton presented evidence calling into doubt Defendants’ good-faith belief that she committed time card fraud sufficient to survive summary judgment. Because I conclude she has, I would reverse summary judgment entered for Defendants.[1]
*735 The evidence in the record, viewed in the light most favorable to Hamilton, as the nonmoving party, see Moore v. Bd. of County Comm’rs, 507 F.3d 1257, 1258 (10th Cir.2007), indicates the following: Hamilton was fired during a meeting with Defendants Laurie Johnson, the office human resources manager, and Robert Harper, a mid-level manager. Johnson told Hamilton, during this meeting, that she was fired because Hamilton had committed time card fraud. Nevertheless, the next day Harper stated to Hamilton’s immediate supervisor, in front of Johnson, that “[w]e do agree with you that Kameisha did not purposefully falsify her timecard.”
The majority, like the district court, discounts Harper’s statement because he was not one of the people who made the decision to fire Hamilton. While that appears to be true, it is not dispositive in this case.[2]
The district court determined that the decision to fire Hamilton was made by three people: 1) the general manager of Boise’s Norman, Oklahoma, office, Defendant Samantha Mohr; 2) Johnson, the human resources manager for that office; and 3) Boise’s regional human resources manager, Diane Wiley. The majority agrees. The evidence supports this conclusion and Defendants have never disputed it.
But the evidence in the record, viewed in the light most favorable to Hamilton, see Moore, 507 F.3d at 1258, further indicates that Haiper, a mid-level manager, was actively involved in the investigation of Hamilton’s time records. Harper was one of only three district sales managers in Boise’s Norman office. Each of these three managers supervised several “teams” of sales representatives, such as Hamilton; each sales team was, in turn, directly supervised by a team leader who reported to one of the three district sales managers.
Although Harper was not Hamilton’s second-level supervisor, he had been watching her attendance for several weeks, apparently because Hamilton had missed a number of days of work. On one occasion while Harper was checking to see if Hamilton was at work, another of Hamilton’s team members complained to Harper that Hamilton had been leaving work early. Harper informed Hamilton’s district sales manager, Larry Woods.
Mohr, Woods and Johnson met over a weekend to review Hamilton’s time records, finding discrepancies. Because Mohr and Woods were scheduled to be out of town on business the following week, Mohr asked Johnson and Harper to meet with both Hamilton and Hamilton’s direct supervisor, Valetta Wright.
Harper and Johnson first met with Wright. It was Harper who took the lead in talking to Wright, questioning her about Hamilton’s time records and informing her that “we” had been investigating the matter for a week or two.
*736 Harper and Johnson next met with Hamilton. Although Harper escorted Hamilton to Johnson’s office and stayed during their meeting, he did not speak. During this meeting, Johnson fired Hamilton. Later that day, Hamilton telephoned her direct supervisor, Wright, to apologize, telling Wright that she had not done anything intentionally.
That afternoon, Harper and Johnson again met with Wright. Wright told Harper and Johnson about the call she had received from Hamilton. At the conclusion of that meeting, Harper and Johnson suspended Wright with pay and sent her home while they investigated further. Johnson and Harper then “continued to look through all the documents we had as well as other time sheets on Ms. [Wright’s] team to verify, to research, to ensure no other time card fraud was taking place.”
The next day, Harper and Johnson called Wright back into work to meet with them again. It was Harper who opened the meeting by informing Wright that “[w]e do agree with you that Kameisha didn’t purposely falsify her timecard.” Wright understood Harper’s reference to “we” to mean Harper and Johnson, who was also present at this meeting.
This evidence, viewed in the light most favorable to Hamilton, indicates that Harper was actively involved in investigating Hamilton’s time records, both before and after her termination, and was in a position to observe Boise’s decisionmakers and to know on what evidence they relied to fire her. In light of that, Harper’s assertion, made in front of one of the decision-makers, that “[w]e agree with you that Kameisha didn’t purposely falsify her timecard,” calls into doubt Defendants’ good-faith belief that Hamilton committed time card fraud. This lingering doubt enables Hamilton to survive summary judgment.
The majority further discounts Harper’s statement to Wright by blurring the distinction between time card fraud and time card mistakes. It has been Boise’s theory throughout this litigation that it fired Hamilton for time card fraud, rather than for simply making mistakes in reporting her time. Boise’s managerial employees have consistently stated that Hamilton was fired for fraud. And Hamilton, too, reported that Defendants cited fraud as the reason they terminated her employment.
Boise has characterized Hamilton’s conduct as fraudulent, rather than mistaken, because under the terms of its personnel manual, Boise could fire Hamilton immediately for fraud, as it did, but would have had to invoke progressive disciplinary measures instead if she had only made mistakes in reporting her time.[3] This appears true even though Hamilton was still a probationary employee at the time she was fired.
Moreover, there is evidence in the record from which a jury could conclude that Hamilton had only made mistakes in reporting her time, and had not committed *737 fraud. Many Boise employees who were trained at the same time Hamilton received her “new-hire” training were confused about how to complete them time sheets. During training, new hires were told that if they had to leave work an hour early one day to attend, say, a medical appointment, the employee could make up that time by working through lunch another day during that same week. The employee had to get her supervisor’s approval before doing so, however. The human resources office instructed employees that if they made up missed time in this manner, the employee should simply record'on her time sheets that she worked eight hours on each of these days, even though the employee had actually worked, for example, seven hours one day and nine hours another. In Hamilton’s case, both Wright and another sales representative testified in their depositions that Hamilton had been working through her lunch hours to make up time she had missed, although this would not have been sufficient to make up all the missed time because the make-up time had to occur during the same week that the hours were lost.
Finally, the majority concludes that, even if there is evidence suggesting that Defendants’ proffered reason for terminating Hamilton — their good-faith belief that Hamilton committed time card fraud — is false, “this is one of those cases” “where it simply would not be permissible to infer discrimination from the evidence [Hamilton] has mustered to show that the employer’s proffered reason” for terminating Hamilton “was false.” The majority explains that, despite the fact that Harper’s statement to Wright, made in front of Johnson, “may provide a scintilla of evidence that Boise’s explanation for terminating [Hamilton] was false[,] ... on this thin basis — and in the face of overwhelming evidence that [Hamilton] was terminated because of unexplained, inaccurate time-keeping — no reasonable jury could find in [her] favor.”
In addition to evidence creating a disputed issue of fact as to whether Defendants’ proffered reason for terminating Hamilton was false, however, the record contains other evidence that supports Hamilton’s allegation that Defendants were acting with a racially discriminatory animus when they fired her. Johnson met with three employees on June 23, 2003, the day she fired Hamilton. By the end of that day, Johnson had fired one employee (Hamilton) and suspended the other two before eventually disciplining them. All three of these employees are African-American women. The adverse employment actions taken against these three women, on a single day, caused several other sales representatives, both black and white, to complain to the human resources department that there was at least an appearance of racial discrimination stemming from these and other disciplinary actions. This evidence supports Hamilton’s assertion that there was a racially discriminatory atmosphere at Boise’s Norman office. This, coupled with evidence from which a jury could find that Defendants’ asserted reason for firing Hamilton — time card fraud — was false, would “permit the inference that unlawful discrimination was a motivating factor” in Defendants’ decision to fire Hamilton.
For these reasons, I would reverse summary judgment entered for Defendants. I would do so reluctantly because the evidence suggesting that Hamilton did in fact commit time card fraud is quite strong. It is likely that, in the face of that evidence, a jury considering the merits of Hamilton’s discrimination claims would conclude that she had in fact committed fraud in recording the time she worked. But at this stage of the litigation, our review is governed by summary judgment principles. See Fed. *738 R.Civ.P. 56(c). And those principles require that, because Harper’s statement is sufficient to create a genuinely disputed issue as to whether Defendants had a good-faith belief that Hamilton committed time card fraud at the time they fired here, Hamilton is entitled to have a jury decide her race discrimination claims.

. I agree with the majority that we have appellate jurisdiction because Hamilton filed a timely notice of appeal following the district court’s June 19, 2006, decision dismissing with prejudice the remaining claims and plaintiffs involved in this litigation. Although neither party argues it, there is another jurisdictional question lurking here, however, because the district court's otherwise final June 19 decision retained jurisdiction to enforce settlement agreements involving Defendants and several other plaintiffs. This court has never considered whether such an order is sufficiently final to provide appellate jurisdiction under 28 U.S.C. § 1291. I would conclude it is, so long as the order is otherwise final and retains jurisdiction only to enforce a settlement agreement. See Futemick v. Sumpter Twp., 207 F.3d 305, 310 (6th Cir.2000) (holding that the “district court's retention of jurisdiction to enforce the terms of a settlement agreement” did not "render[] an otherwise final judgment non-final” because the judgment in essence "resolved all issues on the merits and effectively ended the litigation”); see also Bourg v. Cont’l Oil Co., No. 98-30572, 1999 WL 684161, at *2 & n. 3 (5th Cir. Aug. 13, 1999) (unpublished); cf. Brandner Corp. v. V-Formation, Inc., 98 Fed.Appx. 35, 37 (2d Cir.2004) (unpublished) (referring to district court's order resolving all remaining claims as a “final” order, despite its retention of jurisdiction to enforce settlement, without specifically addressing whether that order was in fact final for 28 U.S.C. § 1291 purposes). See generally Cusumano v. Microsoft Corp., 162 F.3d 708, 710, 712 (1st Cir.1998) (noting “[i]t is settled law that a court’s retention of jurisdiction in order to facilitate tire consideration of possible future relief does not undermine the finality of an otherwise appealable order”); 15B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3915.3 (2008) (noting many district court "[rjeservations or conditions are compatible with finality;” for instance, "[a] judgment that expressly retains jurisdiction to enter merely ministerial orders ... can be final”); 36 C.J.S. Federal Courts § 424 (noting that "[t]he fact that a judgment is subject to reservations or conditions does not automatically deprive the judgment of finality”).

. The majority, without further explanation, "doubts whether [Harper’s] statement would be admissible.” I harbor no such doubts at this stage of the litigation. First and foremost, Defendants have never objected to this statement's admissibility. While they admittedly had a limited opportunity to object to this evidence in the district court, because Hamilton submitted this evidence in her surreply opposing summary judgment, Defendants could have challenged its admissibility on appeal, but did not. Because there is no specific objection to this evidence, it is difficult to address its admissibility in such a vacuum. But, if the majority is concerned that Harper’s statement might be hearsay, Hamilton has all along argued that Harper’s statement is not hearsay, but instead is admissible as a statement of a party opponent, made by Boise’s agent, Harper. As such, it arguably would be admissible. See Fischer v. Forestwood Co., 525 F.3d 972, 983-85 (10th Cir.2008) (applying Fed.R.Evid. 801).

. Boise's progressive discipline policy provided that it would fire an employee for integrity issues, such as fraud. The majority asserts that Boise “could reasonably conclude that these material deviations resulting from being paid for time she did not work raise an issue of integrity making progressive discipline unwarranted.” It might be true that Boise could have deemed mistakes made in completing time cards to rise to the level of an integrity issue. But Boise never made that argument here. Rather, Boise has, all along, indicated that it fired Hamilton for fraud.
The majority asserts that “Mohr testified that it did not matter how [Hamilton's] conduct was characterized because no one doubted that the conduct implicated integrity concerns.” But what Mohr said was, it did not matter how Hamilton characterized her reporting errors, because Boise considered those errors to be fraudulent.